UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Terezia Bolibruch,

Plaintiff,

v.

Andrew Frovarp, *acting in his individual capacity*,

Defendant.

File No. 24-cv-3893 (ECT/LIB)

**OPINION AND ORDER**

---

Eric A. Rice, Law Office of Eric A. Rice, LLC, St. Paul, MN; and Dane DeKrey, Ringstrom DeKrey PLLP, Moorhead, MN, for Plaintiff Terezia Bolibruch.

Ashley Marie Ramstad, Jason M. Hiveley, and Michael Conlin-Brandenburg, Iverson Reuvers Condon, Bloomington, MN, for Defendant Andrew Frovarp.

---

Clay County Deputy Sheriff Andrew Frovarp utilized a "Pursuit Intervention Technique" (or "PIT") maneuver to stop a pickup truck he believed was attempting to flee. Plaintiff Terezia Bolibruch was a passenger in the truck. In this § 1983 case, she claims Deputy Frovarp's use of the PIT maneuver and other actions he subsequently took while detaining and investigating her violated the Fourth Amendment.

Deputy Frovarp seeks summary judgment, arguing he is entitled to qualified immunity. The motion will be granted for the most part, but not entirely. On the plaintiff-friendly version of the record, three of Deputy Frovarp's actions—the PIT maneuver, aiming his firearm in Ms. Bolibruch's direction, and handcuffing and detaining Ms. Bolibruch for a time in the back seat of his squad—did not violate Ms. Bolibruch's

clearly established Fourth Amendment rights. However, based on the same plaintiff-friendly version of the record, a reasonable juror could conclude that Deputy Frovarp's decision to leave Ms. Bolibruch handcuffed for roughly 17 minutes after he determined she had done nothing wrong and without any safety-related justification violated a clearly established right.

## I[1]

On July 29, 2021, Deputy Frovarp was on routine patrol on Highway 10 near Glyndon, Minnesota; at just before 6:00 p.m., he observed a truck he suspected was speeding. ECF No. 23-1 at 14:1–3; 15:7–16:12; ECF No. 24-2 at 2–3. Deputy Frovarp was driving eastbound on Highway 10 when he observed the truck traveling westbound on the same road. ECF No. 24-2 at 2; ECF No. 24-3 at 00:20–26. Deputy Frovarp's squad radar indicated the vehicle was traveling 87 miles per hour in a 65-miles-per-hour zone. ECF No. 23-1 at 16:13–17:8; *see* ECF No. 24-1 at 00:10 (showing radar screen reflecting 87 mile-per-hour speed). After obtaining the radar speed reading, Deputy Frovarp turned around, crossing over to the westbound side of the highway. ECF No. 23-1 at 17:9–14; ECF No. 29-1 at 00:21–28. Deputy Frovarp activated his lights and sirens and pursued the truck. ECF No. 29-1 at 00:27–1:08. As Deputy Frovarp approached from behind, the vehicle's driver slowed down and turned right onto an interchange road. *Id.* at 00:58–1:09. When Deputy Frovarp's squad car got close to the truck, the driver pulled over to the left shoulder of the interchange road and continued to slow down, making it appear the vehicle

---

[1] In accordance with the summary-judgment standards, the facts are undisputed or described in a light most favorable to Ms. Bolibruch.

was going to stop. *Id.* at 1:08–14. Rather than stop, however, the vehicle's brake lights turned off, the truck began to accelerate, and it exited the shoulder and reentered the center of the driving lane on the interchange road. *Id.* at 1:13–18. At this point, Deputy Frovarp utilized a PIT maneuver—he drove his squad into the rear passenger side panel of the truck, causing the truck to spin to the right and come to a stop on the road. *Id.* 1:20–27.

Deputy Frovarp then drew his firearm, exited his squad car, directed the driver of the truck to turn off the vehicle, and commanded the occupants to roll down the windows and put their hands out of the windows. ECF No. 24-1 at 1:23–43. With his firearm still pointed at the truck, Deputy Frovarp approached the truck. *Id.* at 1:43–51. He directed Ms. Bolibruch, who was in the passenger seat, to exit the vehicle, turn away from him, walk backwards towards him, and get on her knees. *Id.* at 2:01–08. Ms. Bolibruch complied. *Id.* Deputy Frovarp then instructed the driver, Mr. Brown, to exit the vehicle, walk backwards, lay down on his stomach, turn his head to the right, and remain still. *Id.* at 2:10–35. Mr. Brown complied at first, though he later turned his head to the left. *Id.* at 2:09–38. Deputy Frovarp yelled at Mr. Brown to turn his head to the right and remain still, and Mr. Brown complied. *Id.* at 2:38–42. Deputy Frovarp then holstered his gun, handcuffed Ms. Bolibruch, and placed her in the back seat of his squad car. *Id.* at 2:41–3:00. While Deputy Frovarp was in the process of handcuffing Mr. Brown, another deputy arrived, and Mr. Brown was placed in the back seat of the second deputy's squad car. *Id.* at 3:04–43. Deputy Frovarp then checked the truck for additional passengers and removed the keys from the ignition. *Id.* at 3:44–4:12.

Deputy Frovarp asked Ms. Bolibruch for identification, but she informed him that she did not have her driver's license with her because she was not driving. *Id.* at 4:47–5:01. Deputy Frovarp asked her name and date of birth, which she provided. *Id.* at 5:10–30. Deputy Frovarp ran Ms. Bolibruch's information, which came back clear,[2] *id.* at 6:07–7:42; ECF No. 23-1 at 54:21–55:2, and asked if Ms. Bolibruch was injured, to which she responded that she was not, ECF No. 24-1 at 8:11–13; ECF No. 29-2 at 8:13–15.

Deputy Frovarp then left to speak with Mr. Brown. ECF No. 24-1 at 8:14–45. By this time, there were at least three officers present, excluding Deputy Frovarp. *Id.* at 8:14–37. Mr. Brown informed Deputy Frovarp that his identification was in his wallet in the truck. *Id.* at 8:43–55. After retrieving Mr. Brown's license from the truck and running the information, Deputy Frovarp returned to interview Mr. Brown. *Id.* at 8:56–13:56. Deputy

---

[2] The parties dispute whether Ms. Bolibruch was cleared after this initial search. Consistent with the summary-judgment standard, I conclude that the plaintiff-friendly version of the record shows that Ms. Bolibruch was cleared after Deputy Frovarp ran the initial search in his computer. Deputy Frovarp's body-worn camera shows that he asked Ms. Bolibruch for her name and date of birth. ECF No. 24-1 at 5:10–30. Ms. Bolibruch provided the requested information, after which Deputy Frovarp immediately entered his squad car and began to run searches on his computer. *Id.* at 5:10–6:25. While running searches, Deputy Frovarp asked Ms. Bolibruch which state had issued her driver's license. *Id.* at 6:25–28. Ms. Bolibruch answered him, after which the computer stated, "License status invalid." *Id.* at 6:25–45. Deputy Frovarp then asked Ms. Bolibruch if she had "ever been in trouble before," and as she answered, he clarified that he meant to ask whether she had never been to jail before or "anything crazy like that." *Id.* at 7:04–21. Deputy Frovarp can be seen entering information into his computer throughout this time. *Id.* at 6:10–7:41. Twice, the computer stated, "NCIC person clear," presumably referring to the National Crime Information Center. *Id.* at 6:26–29, 6:37–40. At that time, Deputy Frovarp did not possess Mr. Brown's name or date of birth, and could not have been running a search on him. It was only after running the initial search on Ms. Bolibruch that Deputy Frovarp collected Mr. Brown's identification, *id.* at 8:42–11:05, after which he ran another search, *id.* at 11:15–13:00, which appears to be on Mr. Brown. The computer can again be heard saying, "NCIC person clear" during the second search. *Id.* at 11:38–51.

Frovarp read Mr. Brown his *Miranda* rights, and Mr. Brown confirmed he wished to speak with Deputy Frovarp. *Id.* at 13:56–14:29. The interview lasted about three minutes. *Id.* at 14:29–17:15. Mr. Brown claimed he did not see Deputy Frovarp initially, and that he pulled over because he thought Deputy Frovarp was attempting to pass him, but he then panicked. *Id.* at 14:40–15:41. Mr. Brown communicated to Deputy Frovarp that Ms. Bolibruch would need to get a ride from his parents because she did not have family or friends near the location of the stop. *Id.* at 16:44–59.

Deputy Frovarp retrieved Mr. Brown's cell phone from the truck, and arrangements were made for Mr. Brown's mother to pick Ms. Bolibruch up at a gas station near the site of the traffic stop. *Id.* at 16:59–22:30. Another officer agreed to give Ms. Bolibruch a ride to the gas station, and Deputy Frovarp retrieved Ms. Bolibruch's cell phone and wallet from the truck. *Id.* at 22:20–37. Ms. Bolibruch was unhandcuffed and placed in another officer's squad car, and Mr. Brown was placed in Deputy Frovarp's squad car. *Id.* at 23:37–24:23; ECF No. 24-4 at 23:25–30; ECF No. 23-1 at 63:11–12. Ms. Bolibruch was dropped off at the gas station, ECF No. 23-2 at 61:2–62:24, and Mr. Brown's parents picked her up, *id.* at 64:1–6. All in all, Ms. Bolibruch was handcuffed for about 22 minutes. *Compare* ECF No. 24-1 at 2:45 (handcuffing Ms. Bolibruch) and *id.* at 23:49 (opening door of second squad car to remove Mr. Brown), *with* ECF No. 24-4 at 22:34 (opening door to remove Mr. Brown from second squad car), and *id.* at 23:29 (showing Ms. Bolibruch entering the second squad car without handcuffs).

Ms. Bolibruch claims Deputy Frovarp (1) used excessive force in conducting a PIT maneuver to stop the truck, (2) used excessive force when he held Ms. Bolibruch at

gunpoint, (3) subjected her to an unreasonable seizure when he placed her in handcuffs, and (4) detained Ms. Bolibruch for an unreasonable amount of time when he held her, handcuffed, in his squad car. Compl. [ECF No. 1] ¶¶ 27–29. For relief, Ms. Bolibruch seeks compensatory, punitive, and other damages, as well as costs, including reasonable attorneys' fees and prejudgment interest, and "any other relief that this Court may deem just and equitable." *Id.* at 5.

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### A

Whether Deputy Frovarp has qualified immunity from Ms. Bolibruch's Fourth Amendment claim depends on the answers to two questions: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations omitted); *see also Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021). Courts may consider the questions in either

order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A § 1983 plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes. *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Sok Kong ex rel. Map Kong v. City of Burnsville*, 960 F.3d 985, 991 (8th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)). If the material facts are not genuinely disputed, then the constitutionality of an officer's conduct is a question of law. *Thompson v. Reuting*, 968 F.2d 756, 759 (8th Cir. 1992); *see also Pollreis v. Marzolf*, 66 F.4th 726, 732 n.2 (8th Cir. 2023); *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

"For purposes of the second prong, [courts] look to 'the legal rules that were clearly established at the time' the action at issue was taken." *Graham v. Barnette*, 5 F.4th 872, 881 (8th Cir. 2021) (quoting *Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004)). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). While Supreme Court "case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation modified). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas*, 595 U.S. at 5–6 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)); *see also Kisela*, 584 U.S. at 104 (stating that "[s]pecificity is especially important in the Fourth Amendment context" and the "[u]se of excessive force

is an area of the law in which the result depends very much on the facts of each case" (citation modified)). As the Eighth Circuit has explained, a plaintiff can show that a right was clearly established in different ways:

> [1] [A] plaintiff may point to existing circuit precedent that involves sufficiently "similar facts" to "squarely govern[ ]" the officer's actions such that the officer had "notice that [his] specific use of force [was] unlawful," *Kisela v. Hughes*, 584 U.S. [100, 104–05] (2018) (per curiam), [2] present "a robust consensus of cases of persuasive authority" doing the same, *see De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017), or [3] demonstrate that a general constitutional rule applied with "obvious clarity" to the facts at issue, *see Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018).

*Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020) (third, fourth, and fifth alterations in original).

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Brown*, 574 F.3d at 496 (citations omitted); *accord Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020). Under that standard, the Court must evaluate all the facts and circumstances surrounding the use of force, "careful[ly] balancing . . . the nature and quality of the intrusion on [Ms. Bolibruch's] Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation modified). "Once the predicate facts are established, the reasonableness of the [officer's] conduct under the circumstances is a question of law." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (citation omitted).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Importantly, the "reasonableness of the force used" is evaluated "from the perspective of a reasonable officer on the scene, not with the benefit of hindsight." *Kohorst*, 968 F.3d at 876. "This evaluation entails careful consideration of the case's particular facts and circumstances, including: '(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Michael v. Trevena*, 899 F.3d 528, 532 (8th Cir. 2018)). "The degree of injury suffered, to the extent 'it tends to show the amount and type of force used,' is also relevant to our excessive force inquiry." *Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012) (citing *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011)). "[F]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019) (quoting *Brown*, 574 F.3d at 499).

B

1

Ms. Bolibruch claims that Deputy Frovarp's use of the PIT maneuver constituted excessive force because a reasonable officer would only have suspected the truck of speeding, which is a petty misdemeanor under Minnesota law. ECF No. 28 at 15; Minn.

Stat. § 169.14, subdiv. 13(a). This is unpersuasive. The plaintiff-friendly version of the facts would indicate to a reasonable officer that the suspect was fleeing the police, which is a felony. Minn. Stat. § 609.487, subdiv. 3. By the time the truck entered the highway interchange road, Deputy Frovarp was close behind in a marked car with sirens and lights activated. ECF No. 29-1 at 1:08–14. That the truck pulled over onto the shoulder and slowed to a crawl, *id.*, would indicate to a reasonable officer that the driver knew the police vehicle was behind them and was aware that the officer was attempting to pull the vehicle over. The truck's sudden release of the brakes, acceleration, and return to the center of the driving lane objectively indicated a decision not to submit to the officer but instead to flee. *See Kaleta v. Johnson*, No. 12-cv-170 (JNE/FLN), 2013 WL 3448148, at *4 (D. Minn. July 9, 2013) ("Where the driver does not immediately stop for the police—even if the driver fails to stop because he is unaware that the police are pursuing him—a reasonable officer could believe that the driver is attempting to flee or resist arrest." (citing *McCoy v. City of Monticello*, 342 F.3d 842, 848 (8th Cir. 2003)); *Moore-Jones v. Quick*, 909 F.3d 983, 986 (8th Cir. 2018) (holding that "[f]rom a reasonable officer's perspective, [a suspect] refused to comply with commands to pull over" when she initially pulled over and then pulled back onto the road and accelerated); *Bowman v. Sheriff of Columbia Cnty. Sheriff's Off.*, No. 24-13195, 2025 WL 2629753, at *1 n.6 (11th Cir. Sept. 12, 2025) ("To be clear, when an officer initiates lights and sirens to effectuate a stop, a driver should promptly stop . . . . If the driver fails to stop and continues driving, it is entirely reasonable for an officer to conclude that the driver is attempting to flee and elude the officer.").

Ms. Bolibruch argues that "[a] reasonable officer would understand that the driver of the [truck] may try to find a safe and suitable site after the interchange for the traffic stop to occur." ECF No. 28 at 14. But "[l]aw enforcement officers are not required to read a suspect's motivations in failing to obey commands—it is enough that the officer reasonably perceives that the suspect is not following orders as given." *Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018). Moreover, the cases cited by Ms. Bolibruch are inapposite. None involved a suspect that began pulling over only to reenter the roadway and accelerate. *See United States v. Fickas*, No. 21-cr-160 (WMW/LIB), 2022 WL 1479764, at *1–2, *10–11 (D. Minn. Feb. 11, 2022), *R. & R. adopted*, 2022 WL 1090885 (D. Minn. Apr. 12, 2022); *United States v. Garrott*, No. 2:25CR79-MHT, 2025 WL 3068739, at *1, *3 (M.D. Ala. Nov. 3, 2025); *United States v. Miller*, 54 F.4th 219, 224, 230 (4th Cir. 2022).

In determining whether use of a PIT maneuver is reasonable, a court must "consider the risk of bodily harm that [the officer's] action posed to [the suspect] in light of the threat to the public that [the officer] was trying to eliminate." *Scott v. Harris*, 550 U.S. 372, 383 (2007). A PIT maneuver may be reasonably used even if the suspect does not pose "an immediate threat" to others at the time it is used. *Christiansen v. Eral*, 52 F.4th 377, 380 (8th Cir. 2022).

No reasonable juror could conclude that Deputy Frovarp's use of the PIT maneuver was excessive. When Deputy Frovarp first clocked the truck, it was traveling 22 miles per hour over the speed limit, which posed a danger to others on the road. And from an objective officer's point of view, the truck attempted to flee once Deputy Frovarp was close

behind it, creating additional reasonable concerns for the safety of others driving on the roadway. When Deputy Frovarp conducted the PIT maneuver, the truck was accelerating from a slow speed; it was not moving at highway speeds at that time. This relatively low speed reduced the risk of injury to Ms. Bolibruch and Mr. Brown. After Deputy Frovarp executed the PIT maneuver, the truck spun around, but it did not leave the road. *See* ECF No. 24-1 at 2:34 (showing the truck's position on the road). At the time, Ms. Bolibruch reported she was uninjured. ECF No. 24-1 at 8:11–13; ECF No. 29-2 at 8:13–15. Balancing the reasonable concerns for the truck's speeding, the attempt to flee, and the relatively low risk of the PIT maneuver used by Deputy Frovarp, excessive force was not used here.

Even if Deputy Frovarp used excessive force in executing the PIT maneuver, Ms. Bolibruch has failed to show that the law was clearly established that using a PIT maneuver in these circumstances violated the Fourth Amendment. On this issue, the Eighth Circuit's decision in *Moore-Jones* is instructive. There, the court addressed an officer's use of a PIT maneuver where the officer had attempted to initiate a traffic stop due to expired car registration. *Moore-Jones*, 909 F.3d at 985. After the officer turned on his lights and sirens, the suspect decelerated, pulled onto the right shoulder, and then pulled back onto the road, where she accelerated to 35–38 miles per hour, maintaining that speed for the remainder of the pursuit. *Id.* The officer then initiated a PIT maneuver, causing the suspect's car to "spin into a ditch, hitting a cement culvert." *Id.* After analyzing other cases in which PIT maneuvers were used, the Eighth Circuit held that the officer's use of the PIT maneuver fell in the "hazy border between excessive and acceptable force," *id.* at

987 (quoting *Mullenix v. Luna*, 577 U.S. 7, 18 (2015)), and thus the officer was entitled to qualified immunity because it was not clearly established that his conduct violated the Fourth Amendment, *id.* This case's facts are remarkably similar to those in *Moore-Jones*. Like the driver in *Moore-Jones*, the driver of the truck was initially suspected of a low-level offense (speeding). However, once Deputy Frovarp attempted to pull the driver over by activating his emergency lights and sirens, Mr. Brown initially began to pull over, but then he accelerated and re-entered the driving lane. In *Moore-Jones*, the Eighth Circuit held the law was not clearly established that an officer's PIT maneuver under similar conditions constitutes excessive force. That determination controls here.

Ms. Bolibruch contends that *Marshall v. West*, 559 F. Supp. 2d 1224 (M.D. Ala. 2008), supports her position that the law was clearly established at the time of the incident. ECF No. 28 at 17–18. There, the court held that law enforcement subjected a suspect to an unreasonable seizure by using a PIT maneuver. *Marshall*, 559 F. Supp. 2d at 1240. The court found that an objectively reasonable officer would not have thought the suspect was fleeing law enforcement by failing to pull over because the officers were in plain clothes and driving in an unmarked vehicle without flashing lights illuminated. *Id.* at 1234–37. We don't have anything like that here.

2

Ms. Bolibruch next claims Deputy Frovarp used excessive force when he held her at gunpoint. Pointing a gun at a suspect may constitute excessive force, *see Clark v. Clark*, 926 F.3d 972, 979 (8th Cir. 2019), particularly when the gun is pointed at a "compliant suspect for an unreasonably long period of time after the police have taken control of the

situation," *Pollreis*, 9 F.4th at 747. "When officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) (citation modified). In *Clark*, the Eighth Circuit held an officer did not use excessive force in pointing a gun at a pulled-over suspect the officers knew to be armed, even after the suspect "signaled compliance by putting his hands out the driver's side window." 926 F.3d at 979. The court held that "[a] reasonable officer was justified in believing the situation was not fully under control until [the suspect] had been removed from the vehicle, patted down, and restrained." *Id.* The court reasoned that "[w]hen [the suspect] stopped his vehicle, officers knew [he] had a weapon, were aware that he had been the only identified person present in an area where shots had reportedly been fired, and had reason to believe he might be a suspect attempting to evade capture." *Id.*

In *Pollreis*, the Eighth Circuit held that an officer did not use excessive force in holding two boys—one twelve and the other fourteen—at gunpoint. 9 F.4th at 741. Officers were "conducting a gang-related stakeout" which resulted in a car chase, leading to a car crash. *Id.* at 740–41. Several of the car's occupants fled on foot, and the officers knew that one of the suspects was often armed. *Id.* Two boys were in the area and matched a description of two of the fleeing suspects. *Id.* at 741. The officer ordered the boys to lie on the ground, and the officer held them at gunpoint for seven minutes until other officers arrived. *Id.* The Eighth Circuit held the officer did not use excessive force in continuing to point his gun at the boys, even though they were compliant, because the situation was

not under control at the time. *Id.* at 748. In other words, because the boys were not restrained, patted down, or definitively identified, and the officer was alone, he was justified in holding the boys at gunpoint. *Id.*

Relying on *Clark* and *Pollreis*, the district court in *Biggs v. City of Maryland Heights* held that an officer did not use excessive force when he pointed his firearm at a suspect for nearly two minutes. No. 4:20-cv-01499-JCH, 2022 WL 1451670, at *6 (E.D. Mo. May 9, 2022), *aff'd*, 2022 WL 17517394 (8th Cir. Oct. 17, 2022). The officer there attempted to conduct a traffic stop, but the suspect continued driving and did not pull over until the officer pulled in front of the suspect's vehicle, forcing him to stop. *Id.* at *1. The officer exited his vehicle, drew his firearm, pointed it at the suspect, and ordered him to raise his hands. *Id.* The suspect was compliant, but the officer did not lower his weapon until backup arrived. *Id.* at *1, *6. The court held the officer's conduct did not constitute excessive force, reasoning that

> all [Officer Munoz] knew was that Biggs did not stop his vehicle for a quarter of a mile, despite Officer Munoz activating his lights and siren. Officer Munoz was not aware of the reason for Biggs's failure to pull over, and it was reasonable for him to believe that Biggs was intoxicated or fleeing, and that he possibly represented a danger to Munoz and the public at large. Pulling his firearm and pointing it at Biggs until he was certain the situation was under control and his safety was not threatened was objectively reasonable under the circumstances.

*Id.* at *7. The circumstances here are comparable to those in *Biggs*. As already discussed, it was objectively reasonable for Deputy Frovarp to believe that Mr. Brown was attempting to flee. Deputy Frovarp was alone, and he pointed his firearm at Ms. Bolibruch only until

he was able to put her in handcuffs. ECF No. 24-1 at 2:42–43. Under these circumstances, it was objectively reasonable to hold Ms. Bolibruch at gunpoint, and Deputy Frovarp only did so until the situation was under control.

Even if Deputy Frovarp used excessive force in holding Ms. Bolibruch at gunpoint, Ms. Bolibruch has failed to show it was clearly established that Deputy Frovarp's conduct was unconstitutional at the time of the incident. Ms. Bolibruch cites *Wilson v. Lamp*, 901 F.3d 981 (8th Cir. 2018), arguing it clearly establishes "that an officer cannot point a firearm at someone who is not threatening or resisting." ECF No. 28 at 19. But *Wilson* does not support Ms. Bolibruch's argument. There, officers believed a convicted child molester named David was meeting a minor girl at a park. 901 F.3d at 985. David had several outstanding warrants. *Id.* A pickup truck the officers knew belonged to David's brother, Levi, left the park. *Id.* The officers followed the truck, and initiated a traffic stop. *Id.* The officers approached the truck with their guns drawn, and commanded the driver to put his hands up. The driver complied. *Id.* One of the officers recognized the driver was Levi. *Id.* The officers ordered him to exit the truck, which he did. *Id.* One of the officers grabbed Levi, threw him against the truck, and pointed a gun at the back of his head. *Id.* The officers patted Levi down, searched the truck, and then left. *Id.* Throughout the stop, Levi and another minor child, who was riding in the vehicle, had at least one firearm pointed at them. *Id.* The Eighth Circuit held that "[t]he officers' drawing and pointing of weapons as they approached the truck, which they reasonably believed was being driven by David, was not excessive." *Id.* at 990. But the Eighth Circuit held the officers used excessive force by continuing to point their weapons, even after the officers realized the

driver was Levi (not David), the passenger was another child, and the officers had patted Levi down. *Id.*

Here, unlike *Wilson*, it was objectively reasonable for Deputy Frovarp to think the truck had attempted to flee, there was no mistake about who the occupants were, Deputy Frovarp was alone, and he stopped aiming his firearm at Ms. Bolibruch once she was handcuffed. *Wilson* does not support the conclusion that Deputy Frovarp used excessive force in holding Ms. Bolibruch at gunpoint, nor does it show the law was clearly established that Deputy Frovarp's conduct violated the Fourth Amendment.

3

Ms. Bolibruch claims she was unreasonably seized when Deputy Frovarp placed her in handcuffs. "During a *Terry* stop, officers must use 'the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop.'" *United States v. Sanford*, 813 F.3d 708, 713 (8th Cir. 2016) (quoting *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010)). "As part of a lawful *Terry* stop, officers may take any measures that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Smith*, 648 F.3d at 659 (citation modified). As the Eighth Circuit has explained:

> [B]ecause handcuffs constitute "greater than a de minimus intrusion," their use "requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in [believing] that the action taken was appropriate." [*El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011)] (first alteration in original) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1122–23 (10th Cir. 2010)). In particular, *Terry* "requires some reasonable belief that the suspect is armed and dangerous or that the restraints

> are necessary for some other legitimate purpose, evaluated on the facts of each case." *Id.* (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005)). We have already held that handcuffing "absent any concern for safety" violates the second *Terry* prong. *Id.* at 460 (citing *Manzanares v. Higdon*, 575 F.3d 1135, 1150 (10th Cir. 2009)).

*Haynes v. Minnehan*, 14 F.4th 830, 835 (8th Cir. 2021) (footnote omitted).

If Deputy Frovarp subjected Ms. Bolibruch to an unreasonable seizure by placing her in handcuffs, Ms. Bolibruch has failed to show Deputy Frovarp's conduct violated clearly established law. In her brief, Ms. Bolibruch does not appear to argue that the law was clearly established in her favor regarding this issue at the time of the incident. *See* ECF No. 28 at 19–20. The two cases she cites in her brief do not clearly establish that Deputy Frovarp's actions were unconstitutional. *See Haynes*, 14 F.4th 830 (holding officer was not entitled to qualified immunity for handcuffing cooperative suspect where there was no basis for safety concerns and no attempt to flee); *El-Ghazzawy*, 636 F.3d at 458 (holding officer violated suspect's Fourth Amendment rights by handcuffing him prior to interviewing him where suspect did not act in a threatening manner or refuse to cooperate and there was no attempt to flee).

4

Ms. Bolibruch argues her continued detention in which she remained handcuffed in the back of Deputy Frovarp's squad car violated her Fourth Amendment rights. A lawful *Terry* stop "may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *El-Ghazzawy*, 636 F.3d at 457 (citation modified). In other words, officers must "employ the least intrusive means of detention and investigation,

in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999). "In assessing whether a detention is too long in duration to be justified as an investigative stop," a court "examine[s] whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). "There is no bright line rule." *Irvin v. Richardson*, 20 F.4th 1199, 1207 (8th Cir. 2021) (citation modified). However, an officer subjects a person to an unreasonably long detention when the person is detained "beyond the amount of time otherwise justified by the purpose of the stop" and "without reasonable suspicion." *Pollreis*, 9 F.4th at 744.

The duration of the stop was not unreasonable. Throughout the stop, Deputy Frovarp was engaged in efforts to investigate the suspected decision to flee. He ran Ms. Bolibruch's information and Mr. Brown's information, and he interviewed Mr. Brown. These actions represented diligent attempts to "confirm or dispel [Deputy Frovarp's] suspicions quickly." *Sharpe*, 470 U.S. at 686. Moreover, Ms. Bolibruch was detained for a total of 22 minutes, and the Eighth Circuit has found longer detentions to be reasonable. *See Williams v. Decker*, 767 F.3d 734, 741–42 (8th Cir. 2014) (holding thirty-minute detention was reasonable where officers removed passengers from the vehicle, handcuffed them, swept the vehicle, questioned the passengers, and searched their criminal histories).

However, Deputy Frovarp's actions in keeping Ms. Bolibruch handcuffed in the back of his squad car after he received information clearing her and after he had no reason to suspect her of any wrongdoing was clearly unreasonable. By that point, other officers

had arrived on the scene, and there was no reason to believe Ms. Bolibruch posed a safety concern. *See Smith*, 648 F.3d at 659. As Deputy Frovarp acknowledged several times, Ms. Bolibruch was only a passenger; she was not the one who attempted to flee. ECF No. 24-1 at 5:48–51, 8:04–10. Ms. Bolibruch was compliant and honest throughout the entirety of her interactions with Deputy Frovarp. *See id.* at 4:49–5:54. At no point did Ms. Bolibruch indicate she was unwilling to cooperate. *Cf. Waters v. Madson*, 921 F.3d 725, 738 (8th Cir. 2019) (holding officers did not use unreasonable force in handcuffing suspect where he displayed "argumentative, evasive, and uncooperative behavior"). Despite this, Ms. Bolibruch remained detained for an additional 17 minutes after Deputy Frovarp ran her information.[3] *See* ECF No. 24-1 at 6:09–8:02. *Cf. Mhanna v. Metro. Council*, No. 21-cv-1974 (ECT/DTS), 2023 WL 3179347, at *10 (D. Minn. May 1, 2023) (finding plaintiff was subject to an unreasonable seizure when officers left her handcuffed for six minutes longer than necessary). In these circumstances, Ms. Bolibruch was subjected to an unreasonable seizure.

Having determined Ms. Bolibruch was unreasonably seized in this respect, the question is whether "case law would have fairly notified every reasonable officer in

---

[3] Even if I am incorrect that the record, viewed in the light most favorable to Ms. Bolibruch, shows that she was cleared after running the initial search, Deputy Frovarp conceded at the hearing that she was cleared when Deputy Frovarp announced to another officer that he was "going to cut her [loose]" and indicated she would need a ride into town. ECF No. 24-1 at 12:20–25. Despite this, Ms. Bolibruch's handcuffs were still not removed for another twelve minutes. *Compare* ECF No. 24-1 at 12:20–25 (indicating Deputy Frovarp was going to cut Ms. Bolibruch loose) *and id.* at 23:49 (opening door of second squad car to remove Mr. Brown), *with* ECF No. 24-4 at 22:34 (opening door to remove Mr. Brown from second squad car), *and id.* at 23:29 (showing Ms. Bolibruch entering the second squad car without handcuffs).

[Deputy Frovarp's] shoes that [his] conduct would violate the Constitution." *Haynes*, 14 F.4th at 837 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Eighth Circuit answered this question in the affirmative in *Haynes*. There, the court explained:

> More than six years before [the defendant officer] Steinkamp handcuffed [the plaintiff] Haynes, we said that it was "well established that if suspects are cooperative and officers have no objective concerns for safety, the officers may not use intrusive tactics such as handcuffing absent any extraordinary circumstances." *El-Ghazzawy*, 636 F.3d at 460. We concluded that "the prior case law provided fair warning to [an officer] at the time of the incident" that a reasonable officer in her place "could not have believed it was lawful to handcuff and frisk a suspect absent any concern for safety." *Id.* And even earlier, we rejected an argument that reasonable suspicion justified handcuffing a suspect after a frisk confirmed that the suspect lacked a weapon or contraband. [*United States v.*] *Tovar-Valdivia*, 193 F.3d [1025,] 1028 n.1 [(8th Cir. 1999)]; *Manzanares* [*v. Higdon*, 575 F.3d [1135,] 1150 [(10th Cir. 2009)] ("[A]ny reasonable officer would understand that it is unconstitutional to handcuff someone absent probable cause or an articulable basis to suspect a threat to officer safety combined with reasonable suspicion.").

*Id.* (footnote omitted)

Deputy Frovarp argues the length of Ms. Bolibruch's detention and handcuffing did not violate the Fourth Amendment because Deputy Frovarp was still conducting his investigation, and he did so in a diligent manner. ECF No. 22 at 20–24, 29–30. But the fact of an ongoing investigation does not on its own entitle an officer to leave a suspect in handcuffs when there is no reason to believe they pose a safety concern. In *Haynes*, police officers conducted a *Terry* stop of Haynes, suspecting his involvement in a drug deal. *Haynes*, 14 F.4th at 832–33. When Haynes could not produce his license, the officers handcuffed him and conducted a pat down. *Id.* at 833–34. Despite finding no weapons

and Haynes being cooperative and polite throughout the interaction, the officers left Haynes in handcuffs for another five minutes. *Id.* at 834, 836. The Eighth Circuit held it was clearly established that Haynes's continued handcuffing for the additional five minutes violated Haynes's Fourth Amendment rights, as Haynes posed no safety concern. *Id.* at 837. In so holding, the court did not rule that the entire *encounter* needed to end five minutes earlier; only that Haynes should not have been left in handcuffs for the five minutes after the objective safety concern had dissipated. *Id.* at 837–38. *El-Ghazzawy* is also instructive here. There, El-Ghazzawy was suspected of selling fake watches. 636 F.3d at 455. When the police officer arrived, she immediately put El-Ghazzawy in handcuffs, despite there being no objective safety concern. *Id.* at 455, 457. The officer subsequently proceeded to investigate the situation. *Id.* at 455–57. The Eighth Circuit held it was clearly established that El-Ghazzawy's handcuffing violated his Fourth Amendment right, but it did not indicate the police officer was wrong to investigate the suspected crime. *Id.* at 460. *Haynes* and *El-Ghazzawy* show that an ongoing investigation does not automatically justify handcuffing, or continued handcuffing, of a suspect when there is no objective safety concern. *See also Tekle v. United States*, 511 F.3d 839, 850 (9th Cir. 2007) (holding it was clearly established that officers could not leave an eleven-year-old boy in handcuffs for fifteen to twenty minutes where he was not attempting to flee and posed no safety concern while police executed warrant).

The cases on which Deputy Frovarp relies are distinguishable. In *Williams v. Decker*, two officers stopped Williams on suspicion that he was operating a vehicle while intoxicated. 767 F.3d 734, 737, 739 (8th Cir. 2014). The officers instructed Williams to

show his hands, but Williams could not hear them, and the officers observed Williams continue to conceal his hands from officers' view. *Id.* at 738, 740–41. The officers drew their firearms, after which Williams and his passenger raised their hands. *Id.* at 738. The officers removed Williams and his passenger from the vehicle and placed them in handcuffs. *Id.* The officers inquired whether the vehicle contained any weapons, and Williams told them he had a firearm in the vehicle. *Id.* The officers proceeded to remove the firearm and conduct a protective sweep of the vehicle. *Id.* The officers retrieved Williams's and his passenger's criminal histories. *Id.* After discovering the passenger had no outstanding warrants, he was permitted to leave. *Id.* However, the police were informed that Williams had "a felony conviction for a weapons violation while intoxicated." *Id.* It took approximately thirty minutes for the officers to conduct their investigation. *Id.* at 742. *Williams* is distinguishable because the officers there knew a firearm was present, and they were informed that Williams's criminal history indicated he was a felon. *Id.* at 738. Again, this case isn't anything like that.

*Waters v. Madson*, 921 F.3d 725 (8th Cir. 2019), is also inapposite. There, officers handcuffed Mr. Waters when he refused to allow Menards store employees to search his trunk prior to leaving the store's lumber yard, in accordance with store policy. *Id.* at 731–32. "The officers did not know Mr. Waters's background and witnessed his argumentative, evasive, and uncooperative behavior," as well as his refusal to comply with officer commands. *Id.* at 738. Additionally, Mr. Waters was "significantly taller than either of the female officers" who had responded to the scene. *Id.* at 732. The Eighth Circuit held that these circumstances justified handcuffing Mr. Waters for twenty minutes until the store

employees and officers were able to inspect Mr. Waters's trunk. *Id.* at 736, 738. As with *Williams*, in *Waters*, the officers did not leave Mr. Waters handcuffed *after* reasonable safety concerns had dissipated. Once the officers realized there was nothing suspicious in the trunk and that Mr. Waters's uncooperative behavior was not due to criminal mischief, he was released.

The remaining cases cited by Deputy Frovarp are equally distinguishable. *See United States v. Sanchez*, 417 F.3d 971, 974–75 (8th Cir. 2005) (holding forty-five minute detention was not unconstitutional where suspect was not held after she had been cleared); *United States v. Bloomfield*, 40 F.3d 910, 917–18 (8th Cir. 1994) (holding hour-long detention without handcuffs was not unreasonable when waiting for drug-sniffing dog to arrive); *Sharpe*, 470 U.S. at 686–88 (holding twenty-minute detention was not unreasonable where suspect was not handcuffed); *Irvin v. Richardson*, 20 F.4th 1199, 1206–07 (8th Cir. 2021) (holding thirteen-minute detention with handcuffs was not unreasonable where officers did not hold suspects after determining they were not involved in possible disturbance involving a gun).

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendant Andrew Frovarp's Motion for Summary Judgment [ECF No. 20] is **GRANTED IN PART** and **DENIED IN PART** as described above.

Dated: October 13, 2026

s/ Eric C. Tostrud
Eric C. Tostrud
Chief Judge, United States District Court